Deverie Christensen, Bar No. 6596
christensend@jacksonlewis.com
Phillip Thompson, Bar No. 12114
Phillip.thompson@jacksonlewis.com
**JACKSON LEWIS P.C.**
300 S. Fourth Street, Suite 900
Las Vegas, Nevada 89101
Tel:  (702) 921-2460
Fax: (702) 921-2461

*Attorneys for Defendant
Bellagio, LLC*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| JORGE ROSALES,<br><br>              Plaintiff,<br><br>       vs.<br><br>BELLAGIO, LLC, a Nevada Corporation;<br>ROE Business Organizations I-X; and DOE<br>INDIVIDUALS I-X, inclusive,<br><br>              Defendants. | Case No. 2:17-cv-03117-JCM-VCF<br><br><br>**DEFENDANT'S RENEWED MOTION FOR<br>SUMMARY JUDGMENT** |

Defendant BELLAGIO, LLC ("Bellagio" or the "Company"), by and through its attorneys, the law firm of JACKSON LEWIS P.C., hereby submits its Renewed Motion for Summary Judgment pursuant to FRCP 56.  This Motion is supported by the attached memorandum of points and authorities, the pleadings and papers on file herein and any other evidence and oral argument this Court may entertain at the hearing of this Motion.

Dated this 14th day of August, 2020.

                                        JACKSON LEWIS P.C.

                                        /s/ Deverie J. Christensen
                                        DEVERIE J. CHRISTENSEN, ESQ.
                                        Nevada Bar No. 6596
                                        PHILLIP C. THOMPSON, ESQ.
                                        Nevada Bar No. 12493
                                        300 S. Fourth Street, Ste. 900
                                        Las Vegas, Nevada 89101

                                        *Attorneys for Defendant Bellagio, LLC*

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.      INTRODUCTION**

3

Bellagio previously moved for summary judgment based on the indisputable evidence that

4

Plaintiff was unable to perform the essential functions of his job with or without a ***reasonable***

5

accommodation.     Indeed, Plaintiff acknowledged under penalty of perjury that the ***only***

6

accommodation he sought to continue in his position was to perform "modified/light work" (*see*

7

Exhibit E, at p. 5:23 – 6:2), having other employees perform some of his job functions, which is

8

unreasonable as a matter of law.   This Court entered summary judgment in favor of Bellagio,

9

finding that Plaintiff "has not provided any evidence showing that unlawful discrimination against

10

employees with disabilities motivated Bellagio's decision to terminate [Plaintiff]."  ECF No. 28.

11

On appeal, the Ninth Circuit reversed, holding that the Court applied the more general

12

disability discrimination standard in evaluating the claim, rather than the more specific law

13

governing an alleged failure to accommodate Plaintiff's disability.   ECF No. 36.  While all three

14

Ninth Circuit judges agreed that this case should be decided under a failure to accommodate

15

standard, Judge Bumatay dissented from the reversal because there were sufficient grounds

16

supported by the record to grant summary judgment in favor of Bellagio; thus he would have

17

affirmed the judgment for purposes of judicial economy.   *Id.* at Dissent pp. 2-7.  While Judge

18

Bumatay "understands the majority's approach in remanding" because "sending the case back is

19

reasonable," he further noted that, "[b]ecause Rosales can't show any reasonable accommodation

20

exists here, [Judge Bumatay] sees no reason to remand this case for the district court ***to merely***

21

***reenter summary judgment for Bellagio***."  ECF No. 36, Dissent pp. 6-7 (emphasis added).

22

As Judge Bumatay adeptly observed, under the failure to accommodate standard, Bellagio

23

can be held liable ***only*** if a reasonable accommodation was, in fact, available and denied to

24

Rosales.   ECF No. 36, Dissent at p. 4 (citing *Snapp v. United Transportation Union*, 889 F.3d

25

1088, 1095 (9th Cir. 2018)).   Here, "Bellagio has shown that no reasonable accommodation

26

existed as a matter of law."  *Id.*   Accordingly, the Court should reenter summary judgment in

27

favor of Bellagio under the failure to accommodate standard.

28

JACKSON LEWIS P.C.
LAS VEGAS

**II.     STATEMENT OF UNDIPUSTED FACTS**

   **A.     Plaintiff's Job Requirements**

   Plaintiff was hired by Bellagio in 1998 as a Room Service Food Server ("Server") and was employed by Bellagio in that capacity until April 28, 2016.  **ECF No. 1-1, Plaintiff's Complaint, ¶ 13.**  As a Server, Plaintiff was tasked with delivering food and beverage orders from the kitchen to hotel guests, among other duties.  **Exhibit A, Plaintiff's Deposition Transcript, at 30:5 – 32:14.**  Large orders, including dishes, trays, hotboxes, and sleeves, routinely exceed 35 pounds, as do kitchen supplies and equipment that Servers must move or carry, such as five-gallon jugs of coffee.  **Id. at 25:3 – 27:21.**  In fact, five gallons of coffee, even without a jug, weighs 41.7 pounds,[1] and a hot box alone (empty) weighs approximately 36 pounds.  **Exhibit B, Deposition Transcript of Mahnaz Gholizadeh, at 43:18 – 19.**  Working as a Server also required Plaintiff to have upper body flexibility, to be able to kneel, reach (up and down), and move freely because Servers are constantly and repetitively getting heavy food items from the kitchen (including from high shelves, low shelves, and other locations), carrying them to guest rooms, and placing food in guest rooms wherever a guest specifies.  **Ex. A at 22:22 – 23:19, 32:25 – 33:8; Exhibit C-1, Room Service Food Server Job Description**.  Servers lift heavy objects and engage in upper-body repetitive movements throughout every workday as a necessary part of their job.  *Id.*

   **B.     Plaintiff's Injury, Treatment, and Permanent Job Restrictions.**

   On May 15, 2014, Plaintiff injured his neck, back, and right shoulder while bringing food to a guest room.  **Ex. A at 33:9-12; Exhibit C, Declaration of Jessica Harbaugh, at ¶ 5.**  Plaintiff underwent surgery on his shoulder in September 2014.  **Ex. A at 42:18-22.**  Plaintiff's pain persisted for another year and he underwent a second surgery in September 2015.  **Id. at 42:23 – 43:19.**  Following the second surgery, Plaintiff's doctor, Firooz Mashood, M.D., believed Plaintiff was ready to return to work, but Plaintiff told Dr. Mashood that he was still in pain and

---

[1]     *See*     https://www.epa.gov/sites/production/files/2014-01/gallonspoundsconversion.xls (providing the weight of water per gallon).

1  could not perform his job.  **_Id._ at 45:14 - 46:22.**  In fact, Plaintiff was "pissed off" because Dr.

2  Mashood "kept on bugging [Plaintiff] that [he] was ready to go back," but Plaintiff "knew that

3  [he] wasn't ready." **_Id._ at 46:12 – 22.**

4         On February 9, 2016, Plaintiff underwent a functional capacity evaluation with Robert

5  Wolinsky, PT, but the results were invalid.  **Ex. C-2.**  On March 2, 2016, Plaintiff underwent a

6  functional capacity evaluation at MML Physical Therapy with Karen Crawford, PT, MS.  **Ex. C-2**

7  **at BLGO-0301.**  This time, the results were valid, and Ms. Crawford identified restrictions for

8  Plaintiff of _occasional_ lifting of up to 36 pounds, and _frequent_ lifting of up to 18 pounds.  **Ex. C-**

9  **3 at BLGO-0238-0239.**

10        On March 10, 2016, Dr. Mashood conducted a final examination of Plaintiff, during

11  which Plaintiff complained of neck and shoulder pain.  _Id._  At the time, Dr. Mashood had

12  reviewed the February 9, 2016, invalid functional capacity evaluation, but had not reviewed the

13  March 2, 2016, valid functional capacity evaluation.  _Id._  Accordingly, Dr. Mashood cleared

14  Plaintiff to return to work at full duty capacity.  _Id._

15        The following day, March 11, Plaintiff's counsel sent a letter to Dr. Mashood along with a

16  copy of the March 2, 2016, valid functional capacity evaluation.  _Id._  On March 15, 2016, Dr.

17  Mashood wrote back to Plaintiff's counsel.  _Id._  Without reevaluating Plaintiff, Dr. Mashood

18  changed his recommendation.  _Id._  This change was based solely on the March 2, 2016, valid

19  functional capacity evaluation that Plaintiff's counsel had provided.  _Id._  Dr. Mashood noted that

20  the functional capacity evaluation found that Plaintiff "demonstrated the ability to return to work

21  at medium work capacity with occasional lifting up to 36 pounds and frequent lifting of 18

22  pounds." _Id._  Based on that evaluation, Dr. Mashood changed his recommendation from clearing

23  Plaintiff to return to work at full duty capacity, to recommending that Plaintiff "return to work

24  with permanent restrictions including maximum lifting of 36 pounds and avoidance of repetitive

25  movements of the neck and avoidance of repetitive reaching overhead on the right side." _Id._

26        **C.     Bellagio Engages in the Interactive Process.**

27        As of March 15, 2016, Plaintiff had a functional capacity evaluation stating that he could

28  engage in _occasional_ lifting of up to 36 pounds, with _frequent_ lifting of up to 18 pounds; and,

based on that evaluation, a doctor's recommendation that Plaintiff return to work with permanent restrictions including maximum lifting of 36 pounds and avoidance of repetitive movement of the neck and avoidance of repetitive reaching overheard on the right side. **Ex. C-3.**

However, Plaintiff, unaware of the March 15, 2016, doctor's recommendation, attempted to return to work with his March 10, 2016, full-duty release. **Ex. A at 46:23 – 48:7.** Plaintiff's supervisor prevented him from working based on his medical restrictions, so Plaintiff showed the supervisor his doctor's release to full duty; however, the supervisor responded that Bellagio had received permanent restrictions from Dr. Mashood. **Id.** Plaintiff's supervisor sent him to speak with Jessica Harbaugh in Human Resources. *Id.* Ms. Harbaugh asked Plaintiff why he was in uniform, and Plaintiff responded that his doctor had released him to go back to work. Plaintiff told Ms. Harbaugh that he knew he was not ready to return to work, but he could do some light work and start little by little. **Ex. A at 48:9 – 48:14.** Plaintiff went home for the day. *Id.* He was subsequently scheduled to meet with Ms. Harbaugh on March 28, 2016. **Ex. C at ¶ 8.**

Prior to meeting with Plaintiff on March 28, 2016, Ms. Harbaugh contacted Mahnaz Gholizadeh, Director of In-Room Dining. Ms. Harbaugh described Plaintiff's restrictions to Ms. Gholizadeh and asked if there was any accommodation that would allow Plaintiff to perform his job as a Server. **Ex. C at ¶ 9.** Ms. Gholizadeh responded that all Servers needed to regularly lift heavy objects, reach overhead, and move their necks repetitively. **Id. at ¶ 10.** Accordingly, there was no way to accommodate someone with Plaintiff's restrictions that would allow him to perform the essential functions of the position. *Id.* Ms. Harbaugh then visited the department to speak with Ms. Gholizadeh in person and observe physical movement of Servers while they work. **Id. at ¶ 11.** Based on the information available at the time, Ms. Harbaugh agreed with Ms. Gholizadeh that, based on the restrictions provided, it appeared that Plaintiff could not perform the essential duties of the job with or without a reasonable accommodation. **Id. at ¶ 12.**

Ms. Harbaugh's next step was to meet with Plaintiff to obtain more information, including which tasks he believed he was capable of performing. **Id. at ¶ 13.** As she testified:

> Q.   Let me make sure that we have exhausted what challenges that you and Mahnaz also talked about. Were there other considerations, other challenges, that you spoke about?

**A. …So are we strictly talking about the first – the time before I met with Jorge?**

Q. What did – well, beforehand, have we exhausted the challenges that you and Mahnaz spoke about?

**A. We talked about the essential functions in – of the position and the restrictions, so, yes, we talked about all that.**

Q. And did you talk about any possible accommodations with Mahnaz?

**A. Based off the information that we had and were discussing that impact the essential functions of the position, we didn't feel *with the information we had currently*, that the accommodation could be feasible.**

Q. So when you say you couldn't decide with the information you had at the time, *was there more information that you needed?*

**A. *That's when I met with Jorge . . . .***

…

Q. Did you discuss – not the job search process, but did you discuss with Mr. Rosales what types of accommodations or – excuse me. Did you discuss with Mahnaz if there were any other accommodations? You said *not based on the information you had. So then you talked to Jorge; correct*?

**A. Correct.**

Q. And what did Mr. Rosales say to you?

**A. He said he felt he could not do the job.**

Q. And why did he think he could not do the job?

**A. He said he frequently lifts over 35 pounds and upwards of 50 pounds regularly. He had trouble with the tables. He had a difficulty pushing and pulling tables up the hill, which is a large hill that goes through the back of the house at Bellagio. He told me that he still had neck and back pain. He told me the tables can weigh upwards, with the items on the table, up to 150 pounds for large parties.**

**He told me he had a hard time with his – you know, keeping his head up. . .**

**Exhibit D, Jessica Harbaugh's Deposition Transcript at 114:2-116:9 (emphasis added).**

Accordingly, Ms. Harbaugh met with Plaintiff on March 28, 2016, to talk with him about his restrictions and learn from him directly which tasks he believed he was capable of performing. *Id.*; **Ex. C at ¶¶ 13, 14.** Plaintiff stated that his injury prevented him from continuing as a Server because of the lifting and movement requirements of the job. **Ex. C at ¶¶ 13, 14; Ex. A at 52:17 – 54:20, 58:2 – 58:13; Ex. D at 115:21 – 116:9.** Plaintiff told Ms. Harbaugh that he understood that he could no longer do all that the job required. **Ex. C at ¶ 14.** As Plaintiff testified during

his deposition:

> It's like, okay.  It was a tough job.  I mean, I did it.  I – I enjoy it.  It was good physical work, and it was good money.  But then I got injured, and **I have to recognize that I cannot do that anymore**. Because if I do it, I'm going to be – I'm going to be, again, having surgery on the arm or the neck . . . Oh, no, no.  **There's no way I can do the heavy work**, um-hum, **that I did for like, 16 years, no** . . . That's why I sign out from the hospitality profession."

**Ex. A at 54:7 – 20 (emphasis added).**

Plaintiff further testified as follows:

> Q.   So we talked about lifting heavy items before your surgery, you were lifting stacks of plates; is that right?
> **A.   Heavy stuff, yeah, a stack of plates, silverware, and they call them chafers, where we put the food.  They are heavy, especially when they have food.**
> **I have to lift – there was some beans where we place the champagne bottles, the wine bottles, the beer bottles, and we have to lift that and put it on the counter, transfer it from the nine-footer to the counter.  Sometimes the counter where we will be bartending was higher.**
> Q.   And to clarify, these are things that you could no longer do today?
> **A.   No, because I knew that I would get injured again.**
> **. . .**
> **[T]hose nine-footers have a lot of impact on your whole body, and it's not like you're going to push the table from this room to the next room.**
> **No, you're going to push this table from the Bellagio tower to the other tower, and you're going to go downhill, uphill.  You're going to have to turn the table to the right, to the left.  You're going to have to pull it sometimes.  So no, I mean, after my injury, I knew I couldn't do that.**
> …
> Q.   So I'm asking about things you could do before your injury that you did to perform your job that you cannot do now, and we mentioned the heavy lifting and pulling and pushing.  I'm wondering if there's anything with your neck pain that you used to be able to do before your injury that today you cannot do?
> **A.   Yes.  Carrying those heavy-like – in VIP services, they have these real heavy coffee containers that you have to be carrying from the service bar without a table, you've got to them right here, push them actually against you, and take them all the way to the VIP area.  So that would put a lot of pressure on my neck that I think it was hurting me big time.**

*Id.* **at 69:17 – 70:21; 75:16 – 76:4.**

Plaintiff also testified, with respect to daily side work activities required of all Servers:

> Q.   And today could you do all of the side work?

**A.  Um, most of the side work.  Some of the side work I couldn't do because it would hurt my arm, like they have a side work setting up tables, and so we have a whole bunch of tables stacked against – not a wall, but there is an area, and you have to be able to pull out the table and not only one, you make – when you do that, you probably end up making 60 of those tables . . . . So that part of the side work, I don't think I could be doing anymore.**

*Id.* **at 80:17 – 81:8.**

The only "light" side work that Plaintiff identified that he was capable of performing was cleaning the beverage station.  ***Id.* at 81:8-12**.  Plaintiff also admitted he could not frequently carry a gallon of milk or juice from the refrigerated storage area to restock the service area where they filled guest orders as part of routine side work.

Q.  Okay. What about when you were doing side work, did you lift anything heavy, such as buckets of ice or anything else that you can think of?
**A.   Before I hurt myself, I remember carrying and being able to carry two gallons in each hand, two gallons of milk, two gallons of orange juice from the walk-in.  Again, they were not close.  So I would carry them and bring them and put them in the fridge where we fill up the orange juice or the milk or whatever.**
Q.   Okay.   And you mentioned that was before your surgery.   So that was something you could not do after your surgery?
**A. No, I couldn't. There was a time that I couldn't even lift one gallon of milk.**
Q.   Okay. And what about today, could you do something like that?
**A.  I can – now I can lift a gallon of milk. I mean, it's still – this still is weak, and I don't know, yeah, I'm afraid I might hurt myself again if I do it too much.**
Q.   Okay. So if you do it like one gallon too much, you could hurt yourself?
**A.   I think if I – if I do it too much, yeah, I can hurt myself.**

**Ex. A at 28:22 – 29:20.**

After the Company determined (and Plaintiff himself acknowledged) that there was no reasonable accommodation that would enable Plaintiff to perform the essential functions of the Server position, Bellagio attempted to accommodate Plaintiff by assisting him with a job search for a position that he could perform within the Company.  **Ex. C at ¶¶ 14, 15.**  To accomplish this, Ms. Harbaugh offered Bellagio's job placement assistance program to Plaintiff.  *Id.*  She

explained to Plaintiff that Bellagio and Plaintiff would work together to search for a vacant position at any MGM Resorts property for which Plaintiff was qualified and able to perform the essential job functions, with or without accommodation. *Id.* Plaintiff agreed to meet with Ms. Harbaugh on a weekly basis so she could assist him in attempting to find a new position within the Company, but he declined to consider any job at any property outside of Bellagio. *Id.* Ms. Harbaugh also explained to Plaintiff that he would have thirty days (from March 28 to April 27) to conduct the job search, and that she would assist him by answering any questions he had and providing him a list of available positions on a regular basis for consideration. *Id.*

Ms. Harbaugh then spoke with Plaintiff about his job skills and experience. *Id.* at ¶ 15. Finally, she printed off the first list of jobs available at Bellagio and discussed some of them with him so that he could review and consider them at home. *Id.* at ¶ 15. As the interactive dialogue required participation of Bellagio and Plaintiff, Bellagio did not "force" Plaintiff to transfer to a position as a reasonable accommodation. Rather, Bellagio worked with Plaintiff to find another position. *Id.* at ¶¶ 14 - 16.

Ms. Harbaugh again met with Plaintiff on April 1, 2016. *Id.* at ¶ 17. She discussed job options with him and provided him with an updated list of available positions at Bellagio. *Id.* On April 5, 2016, Ms. Harbaugh again ran an updated job search and gave an updated list of positions to Plaintiff. *Id.* at ¶ 18. Ms. Harbaugh next met with Plaintiff on April 11, 2016. *Id.* at ¶ 19. During that meeting, Plaintiff expressed to Ms. Harbaugh that he did not want to start over in a new job or learn a new position. *Id.* Plaintiff admitted as much during his deposition, stating:

> I say, "Okay. For example, if I choose something else rather than room service, like a cashier, what is going to happen?"
>
> [Ms. Harbaugh] say, "Well, you've just got to go like anybody else. You've got to follow the policies of the company, the policies of the Union, and you will have to start again all over again."
>
> That was my understanding, that I have to start all over again, from zero working any shift, working any days.
>
> …

> So just to picture that in my mind to say, you know what, even if I
> find something here, *if I have to start all over again, I don't think
> I want to take anything.*

**Ex. A at 65:4 – 25 (emphasis added).**

Even though Plaintiff told Ms. Harbaugh that he did not want to start over in a new job or learn a new position, Ms. Harbaugh continued to try to place Plaintiff in another positions.  She sent him another updated list of available positions within the Bellagio on April 25, 2016 via email.  **Ex. C at ¶ 20.**

**D.      Plaintiff's Termination.**

Plaintiff failed to meaningfully participate in the job search after April 11, when he indicated he was not interested in any job other than Room Service Food Server, which he admitted he could not perform.  The 30-day assisted job search period ended on April 27, 2016, and Plaintiff did not request to extend the job search. ***Id.* at ¶ 21.**  Bellagio terminated Plaintiff's employment because he was unable to perform the essential functions of his position with or without any reasonable accommodation, and he declined to pursue any other available position within the Company for which he was qualified and could perform the essential functions, with or without accommodation.  ***Id.* at ¶ 21.**

**E.      Plaintiff's Alleged Request for an Accommodation was Not Reasonable.**

Plaintiff alleges in his Complaint that, on March 28, 2016, he "requested one more reasonable accommodations," including "modifications that would permit him to perform his pre-injury job, within his doctor's prescribed restrictions, and/or reassignment to another open position."  ECF No. 1-1 at ¶ 19.  During his deposition, Plaintiff explained he told Ms. Harbaugh that he could perform "side work" or light work of the Server position, but he did not describe to Ms. Harbaugh what he meant by that or what specific tasks he could still perform.  **Ex. A, 76:8 – 77:10.**  However, "light work" is not a term that is recognized or used at Bellagio.  In fact, when asked during his deposition what is considered "light work," Plaintiff responded, "What I consider – *and this is my personal opinion – what I consider side work*, it would be … [c]offee orders, regular orders, amenities, which are very light."  **Ex. A at 78:8 – 17.**  Plaintiff also stated he could perform amenities, delivering chocolates, flowers, a bottle of water or champagne, "just

very light stuff." *Id.* **at 78:19-21.**

Ms. Harbaugh denies that Plaintiff ever requested to continue working as a Server and perform only "light work" or "side work." **Ex. C at ¶ 22.** In fact, Ms. Harbaugh took detailed notes during each of her meetings with Plaintiff and never noted any request for an accommodation. **Exs. C-4, C-6, and C-7.** Conversely, Ms. Harbaugh's notes indicate that Plaintiff immediately conceded he could no longer perform his job as a Server. *Id.*

However, as discussed in detail below in Section III(A)(2), even taking Plaintiff's claim that he requested light work as true for purposes of this motion, assigning Plaintiff to perform light or side work was not a reasonable accommodation, because it would require another employee to perform parts of Plaintiff's job (i.e. carry large or heavy orders to rooms and perform heavy side work). Plaintiff has never identified any accommodation that would allow him to perform all of the essential functions of his job.

**F.      Plaintiff's Failure to Complete Vocational Rehabilitation.**

Following his termination as a Server, Plaintiff initially agreed to participate in the Company's Vocation Rehabilitation Program. Plaintiff elected to go to Briarwood College to take an 18-month course to obtain a college degree working with medical records. **Ex. A at 98:17 – 100:23.** He would be paid $1,800 per month while taking the course, and would not have to work. *Id.* However, Plaintiff first needed to obtain a GED because he could not locate his high school diploma from Mexico or obtain a replacement. *Id.* **at 101:17 – 24.** Plaintiff was sent to school to obtain his GED. *Id.* However, Plaintiff was unable to sit through the GED classes. After 20 minutes, his neck would start hurting a lot. *Id.* **at 102:1 – 7.** He also had a problem with his eyes. Then, he began developing headaches. *Id.* **at 102:8 – 11.** Next, he started feeling "pressure on [his] brain." His "brain would be really weird, really weird, like all [his] veins started jumping, moving a lot. [He] felt a lot of pressure, and was scary so [he] went to his doctor." *Id.* **at 102:20 – 25.**

Plaintiff was concerned because brain strokes ran in his family. He underwent an MRI which, thankfully, came out negative. *Id.* **at 103:1 – 16.** However, after that scare, Plaintiff kept having the same symptoms. He called his doctor and asked what he should do. The doctor's

office told him to go to the ER right away.  *Id.* **at 103:17 – 22.**  Following that, Plaintiff chose to

quit the Vocational Rehabilitation Program.  He testified:

> And right there is when I made my choice.  I said, "No, I don't want to go to a hospital.  I don't want to end up in the hospital.  I was afraid.  I was afraid.  I don't want to end up like my uncle or like my dad and so I don't want to take a chance.  If this happens to me, I'm going to stop the whole thing, the study things.  That's the first thing I want to stop.  So I stop.
>
> I stop going to the classes, and I say I want to rest for one week, to see what happens so it went back to normal.  And I say, "No, if I cannot even handle to pass the GED test, I'm not going to be able to handle the [medical records] course that is very intense.
>
> And yeah, it was – it was a very good idea motivating me a lot.  It was good money and all that, but I say, "No, I'd rather – I'd rather be here in good health, not take the risk."  So I went – I went with my lawyer, my attorney, and let them know, you know what –
> . . .
>
> Well, I went to Mr. Ochoa and tell him that I'm quitting . . . ."

*Id.* **at 103:22 – 104:20.**

In summary, Plaintiff told Bellagio Human Resources that he could not do any parts of his

job that required heavy lifting and repetitive movements of his neck, so large orders and heavy or

repetitive side work would need to be performed by another Server instead of Plaintiff.  Plaintiff

declined to pursue any other position within Bellagio because he did not want to give up his

seniority under the collective bargaining agreement with the Union.  Then, he could not take

advantage of the vocational rehabilitation program because sitting down hurt his neck, he

developed eye problems, and he suffered from headaches and pressure in his brain with veins

jumping and moving.

While these circumstances are unfortunate, it is undeniable that between problems lifting,

reaching, pulling, pushing, remaining idle, eye problems, and brain symptoms, Plaintiff could not

continue to work in his position as a Server, with or without a reasonable accommodation.

### G.       Plaintiff Has Not Attempted to Work Since His Departure From Bellagio.

Following his departure from Bellagio, Plaintiff has not worked.  In fact, he has not even

applied for a single job.  **Ex. A at 143:15-19**.  He explained his reasoning during his deposition:

> When I was on unemployment for 11 weeks, I was looking at the

jobs, but, number 1, I always thought about my disability and, like, I will go to Smith's where I shop or Albertson's and 99 Cent store, and I would see the jobs, and I kept on thinking, if I apply here, they're going to to start me the same thing that happened at Bellagio is going to happen here, I'm going to start from the bottom.

**Actually, a lot of those works, since I'm a man, they expect me to carry all the heavy stuff and all of that stuff. So that disappoint me for applying for a lot of jobs.** And I don't know, I think I fell into a depression, and I really – for days, I didn't want to do anything, I didn't feel like doing anything.

It affected me emotionally and physically, because there was a time when I couldn't even – I mean, I'm not even 70, **and I couldn't even get up off of the couch, because I've been pretty much a couch potato since my injuries, my surgeries.**

*Id.* at 144:6 – 24 (emphasis added).

In other words, Plaintiff's injuries and surgeries made it difficult for him to get up off the couch, and he did not believe he could perform jobs at Albertson's, the 99 Cent store, or anywhere else due to his disability. That, of course, begged the question, what was Plaintiff capable of doing following his injury? This was also addressed at Plaintiff's deposition:

Q. And you mentioned before you couldn't do the GED course because sitting there hurt your neck and you had the brain –
**A. Especially because the brain thing, the thing that's the most scary.**
Q. So is there a kind of job that you think you could do today?
**A. The only time – the only thing that I could do is in room service.**

*Id.* at 144:25 – 145:8.

Plaintiff's position in this case is that, due to his disability, he could not lift heavy trays, hot boxes, sleeves, stacks of plates, chafers, or jugs of coffee, and he could not push, pull and turn 9-foot trays, thus he could not take large orders to guests as required by his position as a Server. He also could not perform all the side work required by his job, including setting up or moving tables, lifting or moving heavy items from dry storage, or even move lighter items, such as a gallon of milk or juice, repetitively from refrigerators to the service area where they prepare guest orders. He could barely get up off his couch, yet he could not remain sedentary to complete courses. He also could not work any job at Albertson's or the 99 Cent store. In fact, Plaintiff

testified that there is no kind of job he can do with his disability, other than to perform what, in his opinion, is the "light work" associated with his Server position.

## III.   LEGAL ANALYSIS

**A.   Plaintiff's Failure to Accommodate Claim Must Be Dismissed Because Bellagio Interacted with Plaintiff in Good Faith, but Neither Party Could Identify a Reasonable Accommodation for Him to remain in the Server Position and He Refused to Consider Other Positions within the Company.**

The ADA prohibits employers from discriminating against a disabled employee by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1111 (9th Cir. 2000) (en banc), vacated on other grounds, 535 U.S. 391, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002) (citing 42 U.S.C. § 12112(b)(5)(A)).

If an employee becomes disabled, the employer and employee are required to engage in an "interactive process" in good faith to explore potential reasonable accommodations. *Barnett,* 228 F.3d at 1114-1115. The shared goal is to identify an accommodation that allows the employee to perform the job effectively. *Id.* Both sides must communicate directly, exchange essential information and neither side can delay or obstruct the process. *Id.* at 1115 (citing *Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) ("A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith."). An employer is liable for failure to engage in the interactive process in good faith if *the employer is* responsible for the breakdown in the interactive process *and* a reasonable accommodation without undue hardship to the employer would otherwise have been possible. *Id,* at 1117.

### 1.   Bellagio Engaged in the Interactive Process in Good Faith.

In order to demonstrate good faith, employers can point to cooperative behavior which promotes the identification of an appropriate accommodation." *Barnett*, 228 F.3d at 1115. Employers should "meet with the employee who requests an accommodation, request information

about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome."  *Id.* (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 315 (3d Cir. 1999).

### a.    Bellagio Did Not Make a Final Determination Regarding Potential Accommodations Until it Met with Plaintiff in Person.

Plaintiff has argued in this case that Bellagio failed to engage in the interactive process in good faith because he erroneously claims that HR Business Partner Jessica Harbaugh met with Plaintiff's supervisor, Mahnaz Gholizadeh, prior to engaging in the interactive process, and unilaterally pre-determined that no reasonable accommodation existed that would allow Plaintiff to return to work.  ECF No. 23, pp. 20, 25, 28.

This is both factually unsupported and legally erroneous.  As Judge Bumutay pointed out in his opinion, the Ninth Circuit previously rejected this argument as a basis for finding a lack of good faith because "the law affords employers the ability to have some internal discussion." ECF No. 36 at p. 4, n. 3. (quoting *Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 743 n.15 (9th Cir. 2011) (analyzing claim under similar California antidiscrimination law)).

Ms. Harbaugh's and Ms. Gholizadeh's discussions did not take place *prior to* the interactive process, but rather were *part of* the interactive process.  Ms. Harbaugh met with Ms. Gholizadeh *after* reviewing Plaintiff's restrictions to explore options in preparation for her meeting with Plaintiff.  Ms. Harbaugh specifically testified that she did not make a final decision before speaking with Plaintiff:

> Q.    Let me make sure that we have exhausted what challenges that you and Mahnaz also talked about.  Were there other considerations, other challenges, that you spoke about?
> **A. …So are we strictly talking about the first – the time before I met with Jorge?**
> Q.    What did – well, beforehand, have we exhausted the challenges that you and Mahnaz spoke about?
> **A.    We talked about the essential functions in – of the position and the restrictions, so, yes, we talked about all that.**
> Q.    And did you talk about any possible accommodations with Mahnaz?
> **A.    Based off the information that we had and were**

**discussing that impact the essential functions of the position, we didn't feel *with the information we had currently*, that the accommodation could be feasible.**

Q.  So when you say you couldn't decide with the information you had at the time, *was there more information that you needed?*

**A.  *That's when I met with Jorge . . . .***

…

Q.  Did you discuss – not the job search process, but did you discuss with Mr. Rosales what types of accommodations or – excuse me.  Did you discuss with Mahnaz if there were any other accommodations?  You said *not based on the information you had.  So then you talked to Jorge; correct*?

**A.  Correct.**

Q.  And what did Mr. Rosales say to you?

**A.  He said he felt he could not do the job.**

Q.  And why did he think he could not do the job?

**A.   He said he frequently lifts over 35 pounds and upwards of 50 pounds regularly.  He had trouble with the tables. He had a difficulty pushing and pulling tables up the hill, which is a large hill that goes through the back of the house at Bellagio. He told me that he still had neck and back pain. He told me the tables can weigh upwards, with the items on the table, up to 150 pounds for large parties.**

**He told me he had a hard time with his – you know, keeping his head up.**

**Exhibit D, Jessica Harbaugh's Deposition Transcript at 114:2-116:9 (emphasis added).**

Harbaugh's testimony on this point is crystal clear.  She met with Ms. Gholizadeh to discuss Plaintiff's job functions, restrictions, and potential accommodations.  However, she did not have enough information to make any decision without talking to Plaintiff, so she met with Plaintiff to request information about his condition and what limitations he had and to discuss available alternatives (i.e. the job search for another position).  In other words, Harbaugh followed the letter of the law to a T.  *Barnett*, 228 F.3d at 1115.  This is unsurprising, as Harbaugh was thoroughly trained and highly experienced in handling ADA accommodation requests.  *Id.* at 39:4-41:15.

Plaintiff has proffered no evidence to refute Harbaugh's testimony.  He cannot cite any law to support his arguments that Harbaugh's discussions with Mahnaz to gather as much information as possible before meeting with Plaintiff somehow violated Bellagio's duty to engage in the interactive process.  To the contrary, the Ninth Circuit has held that an employer does not

fail to engage in the interactive process where an employee does not participate in any of the employer's internal conversations regarding available accommodations, as "the law affords employers the ability to have some internal discussions." *Lucent Techs*., 642 F.3d at 742-743, n. 15.

In this case, Defendant engaged in the interactive process with Plaintiff in good faith. Prior to meeting with Plaintiff on March 28, 2016, Ms. Harbaugh contacted Ms. Gholizadeh, described Plaintiff's restrictions, and asked if there was any accommodation that would allow Plaintiff to perform his job as a Server. **Ex. C at ¶ 9**. Ms. Gholizadeh responded that all Servers needed to regularly lift heavy objects, reach overhead, and move their necks repetitively. **Ex. C at ¶ 10**. Accordingly, there was no way to accommodate someone with Plaintiff's restrictions that would allow him to perform the essential functions of the position. *Id.* Ms. Harbaugh then visited the department to speak with Ms. Gholizadeh in person and observe Servers performing their routine work. *Id.* **at ¶ 11.** Based on the information available at the time, Ms. Harbaugh agreed with Ms. Gholizadeh that, based on the restrictions provided, it appeared Plaintiff could not perform the essential duties of the job with or without a reasonable accommodation. *Id.* **at ¶ 12.**

As noted above, Ms. Harbaugh's next step was to meet with Plaintiff to obtain more information, including which tasks he believed he was capable of performing. **Ex. D at 114:2-116:9**; **Ex. C at ¶¶ 13, 14.** Accordingly, Ms. Harbaugh met with Plaintiff on March 28, 2016, to talk with him about his restrictions and abilities. Plaintiff agreed his doctor's restrictions prevented him from continuing as a Server because of the lifting and movement requirements of the job. **Ex. C at ¶¶ 13, 14; Ex. A at 52:17 – 54:20, 58:2 – 58:13; Ex. D at 115:21 – 116:9.** Plaintiff understood that he could no longer do all that the job required. **Ex. C at ¶ 13, 14.**

2. **Plaintiff Refused to Consider Another Position within the Company.**

After the Company determined (and Plaintiff himself acknowledged) that there was no reasonable accommodation that would enable Plaintiff to perform the essential functions of the Server position, Bellagio attempted to accommodate Plaintiff by helping him find a job he could perform within the Company. *Id.* **at ¶ 14 - 16.** To accomplish this, Ms. Harbaugh offered

Bellagio's job placement assistance program to Plaintiff.  *Id.*   Notably, Ms. Harbaugh did not discuss this option with Plaintiff ***until after*** she had talked with him about his ability to continue in the Server position.  *Id.* **at ¶ 14.**  She explained to him that Bellagio and Plaintiff would work together to search for a vacant position for which Plaintiff was qualified and able to perform the essential job functions, with or without accommodation.  *Id.*  Plaintiff agreed to meet with Ms. Harbaugh on a weekly basis so she could assist him in attempting to find a new position within the Company.  *Id.*  Ms. Harbaugh also explained to Plaintiff that he would have thirty days (from March 28 to April 27) to conduct the job search; and, that she would assist him by answering any questions he had and providing him a list of available positions on a regular basis for consideration.  *Id.*

Ms. Harbaugh then spoke with Plaintiff about his job skills and experience.  *Id.* **at ¶ 15.**  Finally, she printed off the first list of jobs available at Bellagio and discussed some of them with him so that he could review and consider them at home.  *Id.*  As the interactive dialogue required participation of Bellagio and Plaintiff, Bellagio did not "force" Plaintiff to transfer to a position as a reasonable accommodation.  Rather, Bellagio worked with Plaintiff to find another position.  *Id.* **at ¶¶ 14 - 16.**

Ms. Harbaugh again met with Plaintiff on April 1, 2016.  *Id.* **at ¶ 17.**  She discussed job options with him and provided him with an updated list of available positions at Bellagio.  *Id.*  On April 5, 2016, Ms. Harbaugh again ran an updated job search and gave an updated list of positions to Plaintiff.  *Id.* **at ¶ 18.**  Ms. Harbaugh next met with Plaintiff on April 11, 2016.  *Id.* **at ¶ 19.**  During that meeting, Plaintiff expressed to Ms. Harbaugh that he did not want to start over in a new job or learn a new position.  *Id.*  Ultimately, Plaintiff declined to apply for any other open position and did not seek to extend the job search.

In short, Defendant was not responsible for any alleged failure in the interactive process.  *See, e.g., Dep't of Fair Employment & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 743 (9th Cir. 2011) (an employee cannot overcome summary judgment on a claim of failure to reasonably accommodate where the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to

engage in discussions in good faith.).   Defendant met with Plaintiff on multiple occasions, requested and obtained information about his condition and limitations, discussed with Plaintiff what he wanted, considered his desires, and discussed alternatives.   Defendant did exactly what the law requires.  *Barnett*, 228 F.3d at 1115.

Plaintiff cannot fail to engage in the interactive process and later claim that he was deprived of such process.  He was not interested in any of the available jobs at Bellagio and did not suggest viable alternative reasonable accommodations.  Simply put, he wanted to go back to being a Server, performing only "light work," and was not truly interested in exploring other opportunities that could potentially keep him working.  *See* Plaintiff's deposition transcript, in which he testified that he told Ms. Harbaugh, "if I have to start all over again, I don't think I want to take anything."  **Ex. A at 65:4 – 25**.   Accordingly, while Defendant acted in good faith, Plaintiff failed to do so, and summary judgment is appropriate.

**B.      Plaintiff's Failure to Accommodate Claim Must Be Dismissed Because No Reasonable Accommodation Existed to Allow Him to Perform His Job.**

While the evidence in this case clearly establishes that Bellagio engaged in the interactive process in good faith, even if Bellagio had failed to meet its obligation, it still could not be held liable for disability discrimination because no reasonable accommodation was available. Employers who fail to engage in the interactive process in good faith face liability *only* "if a reasonable accommodation would have been possible."  *Barnett*, 228 F.3d at 1116.  *See also Snapp v. United Transportation Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) ("[T]here exists no stand-alone claim for failing to engage in the interactive process. Rather, discrimination results from denying an available and reasonable accommodation.").   As Judge Bumatay correctly pointed out, during Plaintiff's meeting with Bellagio, and throughout these proceedings, Plaintiff has failed to identify a reasonable accommodation which would have allowed him to perform the essential functions of the Server position.  ECF No. 36 at p. 3.

**1.      Preparing Large Orders and Bringing them to Guests are Essential Functions of the Server Position.**

Essential functions of the job are "fundamental job duties of the employment position . . . not including the marginal functions of the position."  29 C.F.R. § 1630.2(n)(1).  Functions may

be essential for various reasons, including that the position exists to perform those duties and that there are a limited number of employees to perform the function. *Id.* The ADA requires in assessing a position's essential functions that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); *E.E.O.C. v. Amego, Inc.*, 110 F.3d 135, 147 (1st Cir. 1997) (inquiry into essential functions is not intended to second-guess an employer's business judgment); *Riel v. Electronic Data Systems, Inc.*, 99 F.3d 678, 682 (5th Cir. 1996) ("substantial deference" to be given to employer's written description of "essential functions"). In addition, the court may consider: "[t]he amount of time spent on the job performing the function," "[t]he consequences of not requiring the [employee] to perform the function," and the work experience of current and former employees. 29 C.F.R. § 1630.2(n)(3)(iii)-(vii).

The Bellagio Room Service Food Server job description sets forth certain physical requirements that the Bellagio considers to be essential. These include lifting and carrying 35 pounds, upper body flexibility, reaching, standing, and walking. **Exhibit C-1, Room Service Food Server Job Description**. While any Server must be able to comply with these minimum physical requirements, it is obviously impossible to provide every essential function on a form checklist.

Clearly, the most essential function of the Server position is to deliver and set-up food and beverage orders to guests; as Plaintiff testified, that requires lifting in excess of 40 pounds[2] and pushing and pulling heavy carts and trays over long distances. Large orders, including dishes, trays, hotboxes, and sleeves, routinely exceed 35 pounds, as do kitchen supplies and equipment that Servers must lift, carry, and move, such as five-gallon jugs of coffee. **Ex. A at 25:3 – 27:1.** Side work is also essential, and that requires moving and lifting heavy items such as room service

---

[2] This, of course, differs by five pounds from the 35-pound lifting requirement in the job description. Consistent with Plaintiff's testimony that Servers are often required to lift more than 40 pounds, Ms. Harbaugh testified that the 35-pound requirement set forth in the job description means *at least* 35 pounds. **Ex. D at 44:14-19.**

delivery tables, boxes of food service items to restock the area where Servers prepare guest orders, silverware, dishes, and other items such as gallons of milk and juice.  *Id.* **at 80:17 – 81:12; 25:3 – 27:1; 28:22 – 29:20.**

 2. **Plaintiff Admitted in His Deposition That He Could Not Perform the Essential Functions of His Job, Thus he is Not a Qualified Individual.**

 As noted above, Plaintiff's final doctor's note from Dr. Mashood lists Plaintiff's permanent restrictions, including maximum lifting of 36 pounds (**Ex. C-3**), while the job description of the Server position lists a 35-pound lifting requirement (**Ex. C-1**).  Dr. Mashood's report further requires Plaintiff to avoid repetitive movements of the neck and avoidance of repetitive reaching overhead on the right side (**Ex. C-3**), while the job description requires "reaching" (**Ex. C-1**).  Based on Plaintiff's discovery strategy in this case, Defendant anticipates that Plaintiff will argue that he could perform the essential functions of his job because he could lift one pound more than the requirement set forth in the job description (36 pounds versus 35 pounds), and he could satisfy the reaching requirement by reaching with his left side (whereas his permanent restrictions limit reaching on the right side).

 Plaintiff's argument should be disregarded for several reasons.  First, Plaintiff now seeks to rely solely on the permanent physical restrictions that Dr. Mashood provided, rather than Plaintiff's own beliefs regarding his limitations.  As detailed above, Plaintiff testified that he was far more limited physically than Dr. Mashood noted in the doctor's note.  Plaintiff readily admits he could not perform several key aspects of his job, including pushing, pulling, moving tables, and delivering heavy orders to guests, among other tasks.  **Ex. A at 54:7 – 20, 69:17 – 70:21; 75:16 – 76:4, 80:17 – 81:8; 28:22 – 29:20**.  Moreover, Plaintiff testified that Dr. Mashood has routinely overestimated Plaintiff's physical abilities.  Following Plaintiff's second surgery, Dr. Mashood believed Plaintiff was ready to return to work, but Plaintiff told Dr. Mashood that he was still in pain and could not perform his job.  *Id.* **at 45:14 - 46:22.**  Plaintiff testified that he was "pissed off" because Dr. Mashood "kept on bugging [Plaintiff] that [he] was ready to go back," but Plaintiff "knew that [he] wasn't ready."  *Id.* **at 46:12 – 22.**  It defies logic for Plaintiff to say now that he could perform the essential functions of the Server position just because Dr. Mashood noted Plaintiff could lift up to 36 pounds.

Additionally, as noted above, Dr. Mashood cleared Plaintiff to work with no restrictions on March 10, 2016. **Ex. C-3.** It was only when Plaintiff's counsel provided Dr. Mashood with a functional capacity evaluation by Ms. Crawford that Dr. Mashood changed his recommendation. *Id.* Dr. Mashood did not see Plaintiff again before changing his recommendation, so the change was based entirely on Ms. Crawford's report. Ms. Crawford's report stated that Plaintiff could engage in *occasional* lifting of up to 36 pounds with *frequent* lifting of up to 18 pounds. **Ex. C-3.** The Server position requires Plaintiff to lift 36-pound hot boxes frequently throughout every work day, among many other items exceeding 18 pounds. Hot boxes weigh 36 pounds when empty, before loading with plates, food, and guest items. **Ex. D at 43:16 – 21.**

Of course, even more important is the fact that Plaintiff readily concedes that he could not do the job, testifying:

> It's like, okay. It was a tough job. I mean, I did it. I – I enjoy it. It was good physical work, and it was good money. But then I got injured, and I have to recognize that I cannot do that anymore. Because if I do it, I'm going to be – I'm going to be, again, having surgery on the arm or neck . . . Oh, no, no. There's no – no way I can do the heavy work, um-hum, that I did for like, 16 years, no . . . . That's why I sign out from the hospitality profession."

**Ex. A at 54:7 – 20.**

> Q.   So we talked about lifting heavy items before your surgery, you were lifting stacks of plates; is that right?
> **A.  Heavy stuff, yeah, a stack of plates, silverware, and they call them chafers, where we put the food. They are heavy, especially when they have food.**
> **I have to lift – there was some beans where we place champagne bottles, the wine bottles, the beer bottles, and we have to lift that and put it on the counter, transfer it from the nine-footer to the counter.  Sometimes the counter where we will be bartending was higher.**
>
> Q.   And to clarify, these are things that you could no longer do today?
> **A.  No, because I knew that I would get injured again.**
>
> . . .
>
> **[T]hose nine-footers have a lot of impact on your whole body, and it's not like you're going to push the table from this room to the next room.**
> **No, you're going to push this table from the Bellagio tower to the other tower, and you're going to go downhill, uphill.  You're going to have to turn the table to the right, to**

1    **the left.  You're going to have to pull it sometimes.  So no, I
      mean, after my injury, I knew I couldn't do that.**

2        …

3        Q.  So I'm asking about things you could do before your
      injury that you did to perform your job that you cannot do now,
4     and we mentioned the heavy lifting and pulling and pushing.  I'm
      wondering if there's anything with your neck pain that you used to
5     be able to do before your injury that today you cannot do?
         **A.   Yes.   Carrying those heavy-like – in VIP services,**
6     **they have these real heavy coffee containers that you have to be
      carrying from the service bar without a table, you've got to put**
7     **them  right  here,  push  them  actually  against  you,  and  take
      them all the way to the VIP area.  So that would put a lot of**
8     **pressure on my neck that I think it was hurting me big time.**

9     *Id.* at 69:17 – 70:21; 75:16 – 76:4.

10       Q.  And today could you do all of the side work?
         **A.  Um, most of the side work.  Some of the side work I**
11    **couldn't do because it would hurt my arm, like they have a side
      work  setting  up  tables,  and  so  we  have  a  whole  bunch  of  tables**
12    **stacked against – not a wall, but there is an area, and you have
      to be able to pull out the table and not only only one, you make**
13    **– when you do that, you probably end up making 60 of those
      tables . . . .   So that part of the side work, I don't think I could**
14    **be doing anymore.**

15    *Id.* at 80:17 – 81:8.

16       Q.  Okay. What about when you were doing side work, did
17    you lift anything heavy, such as buckets of ice or anything else that
      you can think of?
18       **A.   Before I hurt myself, I remember carrying and
      being able to carry two gallons in each hand, two gallons of**
19    **milk, two gallons of orange juice from the walk-in.  Again, they
      were not close.  So I would carry them and bring them and put**
20    **them in the fridge where we fill up the orange juice or the milk
      or whatever.**
21       Q.   Okay.   And you mentioned that was before your
      surgery.  So that was something you could not do after your
22    surgery?
         **A.  No, I couldn't. There was a time that I couldn't even**
23    **lift one gallon of milk.**
         Q.  Okay. And what about today, could you do something
24    like that?
         **A.  I can – now I can lift a gallon of milk. I mean, it's**
25    **still – this still is weak, and I don't know, yeah, I'm afraid I
      might hurt myself again if I do it too much.**
26       Q.  Okay. So if you do it like one gallon too much, you
      could hurt yourself?
27       **A.  I think if I – if I do it too much, yeah, I can hurt
      myself.**

28

**Ex. A at 28:22 – 29:20.**

Finally, Plaintiff's testimony is consistent with the testimony of Ms. Harbaugh and Ms. Gholizadeh that the 35-pound lifting requirement contained in the job description means *at least* 35 pounds. Additionally, the job description provides a standard checklist of physical requirements, which is used company wide, with checkboxes to mark those that apply to a given position. **Ex. C-1.** Of course, a generic list of physical activities cannot encompass all the tasks essential to each unique job. These factors explain Plaintiff's testimony, consistent with that of Ms. Harbaugh and Ms. Gholizadeh, that Plaintiff could not perform the duties of the Server position, despite Dr. Mashood providing a lifting limitation one pound in excess of the 35-pound requirement found in Plaintiff's job description. The job is simply too complex to be evaluated with one sentence from a doctor's note and one checklist of job functions. That is why Ms. Harbaugh engaged in the interactive process with Plaintiff, performed an individualized assessment of what he told her he could and could not do, spoke with Plaintiff's department head, and personally observed how the Servers work, before telling Plaintiff that there was no reasonable accommodation that would allow him to perform the essential functions of his position.

As Plaintiff readily admits the job required lifting, carrying, pushing, pulling, and other movement he could not perform, his only remaining argument is that he could have carried light orders and performed light side work, leaving other Servers to bring heavy orders to guests. However, "[the ADA] does not require an employer to accommodate a disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous." *Kvorjak v. Maine*, 259 F.3d 48, 57 (1st Cir. 2001); *Larkins v. CIBA Vision Corp.*, 858 F. Supp. 1572, 1583 (N.D. Ga. 1994) (ADA does not require employer 'to eliminate an essential function' of a position). The "ADA does not require an employer to relieve the employee of any essential functions of the job, modify the actual duties, or reassign existing employees or hire new employees to perform those duties." *Robertson v. Neuromedical Center*, 161 F.3d 292, 295 (5th Cir. 1998). Nor does the ADA "require an employer to transfer from the disabled employee any of the essential functions of his job." *Barber v. Nabors Drilling U.S.A.,*

*Inc.*, 130 F.3d 702, 709 (5th Cir.1997).

Plaintiff has no evidence demonstrating that he was a qualified individual with a disability protected by the ADA because he was unable to perform the essential functions of the Server position; and neither he, his doctor, nor Bellagio were able to identify any reasonable accommodations that would enable him to perform the essential job functions of a Server, or any other vacant positions for which he was qualified. Indeed, the evidence is clear that Plaintiff was permanently restricted in his physical activities which prevented him from performing the essential functions of the position. Therefore, Plaintiff was not qualified for the Server job.

**C.    Plaintiff's Failure to Accommodate Claim Must be Dismissed Because the Only Accommodation Plaintiff Has Ever Identified is Unreasonable as a Matter of Law.**

As discussed above, to establish liability under a failure to accommodate theory, Plaintiff is required to show that a reasonable accommodation existed that would have allowed him to perform the essential functions of his position. However, Plaintiff has <u>never</u> identified a reasonable accommodation in this case.

Plaintiff alleges in his Complaint: "On or about March 28, 2016 the Plaintiff requested one or more reasonable accommodations so that he could maintain his 17+ years of employment. This included requesting modifications that would permit him to perform his pre-injury job, within his doctor's prescribed restrictions . . . ." ECF No. 1-1 at ¶ 19., He further alleged in his Complaint that "Plaintiff was denied a reasonable accommodation [which] would have permitted Plaintiff to perform the essential functions of his job." *Id.* at 16, ¶ 26.

In written discovery, Bellagio directly asked Plaintiff to specify what reasonable accommodations he sought, as referenced in these paragraphs of his Complaint. Plaintiff responded: "I requested that I be able to remain in the room service department running, performing ***modified/light work*** and regular orders, not losing my seniority, schedule and days off." **Exhibit E, Plaintiff's Response to Interrogatory No. 5 (emphasis added)**. Under this scenario, Plaintiff's coworkers would be tasked with performing the portions of the job Plaintiff was unable to complete.

This is unreasonable as a matter of law. *Rund v. Charter Communs.*, 319 Fed. Appx. 465,

467 (9th Cir. 2008) (the duty to provide a reasonable accommodation for a disabled employee does not obligate the employer to create a light duty position and coworkers cannot reasonably be required to perform some of a disabled employee's  functions on a permanent basis);  *Howell v. Michelin Tire Corp.*, 860 F. Supp. 1488, 1492 (M.D. Ala 1994) ("reasonable accommodation, however, does not require that an employer create a light duty position or a new permanent position"); *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 912-13 (7th Cir. 1996) (The ADA does not require an employer to create a light duty position for a disabled employee when one does not already exist.); *Allen v. Ga. Power Co.*, 980 F. Supp. 470, 478 (N.D. Ga. 1997) ("numerous courts have held that where an employer does not have a permanent 'light duty' position, it is not required to create one or convert a temporary 'light duty' position into a permanent one" to accommodate an employee's disability").

Similarly, "[t]he law does not require an employer to accommodate a disability by . . . reallocating essential functions to make other workers' jobs more onerous." *Mulloy v. Acushnet Co.*, 460 F.3d 141, 153 (1st Cir. 2006) (quoting *Kvorjak v. Maine,* 259 F.3d 48, 57 (1st Cir. 2001)).   "[T]he ADA does not require an employer to exempt an employee from performing essential functions or to reallocate essential functions to other employees." *Dark v. Curry County*, 451 F.3d 1078, 1089 (9th Cir. 2006).  An employer "need not restructure [an employee's] position by exempting him from the essential dut[ies]." *Id.*  The "ADA does not require an employer to relieve the employee of any essential functions of the job, modify the actual duties, or reassign existing employees or hire new employees to perform those duties." *Robertson v. Neuromedical Center*, 161 F.3d 292, 295 (5th Cir. 1998).  Nor does the ADA "require an employer to transfer from the disabled employee any of the essential functions of his job." *Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702, 709 (5th Cir.1997).

In his verified interrogatory responses, Plaintiff admits the only accommodation he requested from Bellagio was to perform *"modified/light work."*  **Ex. E, at Response to Interrogatory No. 5**.  Throughout this litigation, he has never identified a reasonable accommodation that would allow him to perform the Server position without reassigning tasks to other employees.  For this reason, his claim fails as a matter of law.

**D.      Plaintiff Has Failed to Establish Any Evidence to Support Punitive Damages.**

Under the ADA, "[a] complaining party may recover punitive damages . . . if [he] demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).  Further, while punitive damages may be available in an ADA discrimination case, Plaintiff has not set forth any evidence demonstrating that Defendant acted with malice or reckless indifference toward his rights under the ADA.  In fact, the undisputed evidence shows that Defendant has a long history of working with Plaintiff to accommodate his physical restrictions.  Defendant's good faith conduct simply does not rise to the level of malice or reckless indifference.  As such, summary judgment on Plaintiff's claim for punitive damages is warranted.

## IV.      <u>CONCLUSION</u>

For each and all the reasons stated above, Bellagio respectfully requests summary judgment be granted in its favor and against Plaintiff on all claims.

Dated this 14th day of August 14, 2020.

JACKSON LEWIS P.C.

/s/ Deverie J. Christensen
Deverie J. Christensen, Bar No. 6596
Phillip Thompson, Bar No. 12114
300 S. Fourth Street, Suite 900
Las Vegas, Nevada 89101

*Attorneys for Defendant Bellagio, LLC*

JACKSON LEWIS P.C.
LAS VEGAS

1

**CERTIFICATE OF SERVICE**

2

        I HEREBY CERTIFY that I am an employee of Jackson Lewis P.C., and that on this 14th

3

day of August, 2020, I caused to be served via the Court's CM/ECF electronic filing and service

4

system, a true and correct copy of the above foregoing **DEFENDANT'S RENEWED MOTION**

5

**FOR SUMMARY JUDGMENT** properly addressed to the following:

6

James P. Kemp
Victoria L. Neal

7

KEMP & KEMP
7435 West Azure Drive, Suite 110

8

Las Vegas, Nevada 89130

9

*Attorneys for Plaintiff*
*Jorge Rosales*

10

11

                                   */s/ Kelley Chandler*
                                   Employee of Jackson Lewis P.C.

12

13

4836-5425-4023, v. 2

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JACKSON LEWIS P.C.
LAS VEGAS